UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAROL JOHNSON,

        Plaintiff,

     v.

METROPOLITAN LIFE INSURANCE
COMPANY,

        Defendant.

CIVIL ACTION

NO. 1:06-CV-2851-CAP

**O R D E R**

This matter is before the court on the defendant's motion for summary judgment [Doc. No. 19].

**FACTS**

**I.    The MetLife LTD Policy**

The plaintiff's employer, Cingular Wireless LLC, contracted with the defendant, MetLife, to provide long term disability ("LTD") benefits for its employees.   MetLife pays disability benefits to insured employees under this policy from its own assets.   Cingular delegated the responsibility for disability claims and appeals determination to MetLife, as follows:

> The Disability Plan is administered by the Administrative Committee of the Company.  You should consult the Other Important Information Section for more information regarding the Administrative Committee's authority to administer the Plan.  The Administrative Committee has delegated authority for claims determination and claims review on appeal to the Claims Administrator, MetLife.

Summary Plan Description [Doc. No. 19-6], p. 22.

Under MetLife's long term disability policy, "Disability" is defined as follows:

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

*   *   *

after the first 36 month period, you are unable to earn more than 50% of your Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

Cingular LTD Plan (the "Plan") [Doc. No. 19-5], p. 7.   No disability benefits are payable under the policy if the disability claim is not approved by MetLife.

## II.  The Plaintiff's Job

The plaintiff worked for Cingular as a "Field Coordinator, Global Accounts."  She described her job duties to MetLife as including: identifying, documenting and implementing contract requirements; managing accounts; analyzing and distributing usage reports; documenting account revenue growth/decline; preparing proposals, bids, and quotes; recommending solutions to customers; consulting on equipment, technology, rate plans, and service areas; ordering inventory; and resolving questions, problem escalations, and executive complaints/requests.  Claim File [Doc. No. 19-22], p. CL 659.  As of her last day of work, the plaintiff had worked for

-2-

Cingular for more than 13 years. MetLife characterized the plaintiff as having a "strong work and educational history." Claim File [Doc. No. 19-7], p. CL 025.

### III. __The Plaintiff's Prior Medical History__

In the late 1980s, the plaintiff suffered heart failure. This significant myocarditis appeared at first to be viral in nature, and seemed to largely resolve itself. The plaintiff continued working with this and several other problems including asthma, systemic arterial hypertension, endometriosis which warranted a total hysterectomy, and a torn meniscus in her right knee from a car accident.

On or about October 1994, the plaintiff had marked dyspnea (shortness of breath) on exertion and some atypical chest pain. She was evaluated by her pulmonologist, who ordered a chest x-ray. The chest x-ray was suggestive of cardiac silhouette enlargement and increased interstitial flow. On October 19, 1994, the plaintiff again suffered congestive heart failure with cardiomyopathy diagnosed by echocardiogram, and was admitted for a hospital stay.

The plaintiff continued to work, but by 1997 was experiencing fatigue, low energy, dry mouth, polyuria, leg cramps, and blurred vision. She was diagnosed with diabetes mellitus on August 26, 1997, and was once again hospitalized. At this point, she had a

progressive 12-pound weight loss, generalized malaise, and altered mental status.   She was found to be hyperglycemic in diabetic ketoacidosis, with blood sugars greater than 600.

On July 20, 1999, an echocardiogram revealed that the plaintiff had mild left ventricular dysfunction, an ejection fraction of 45-50%, mild global hypokinesis, and mild to moderate mitral regurgitation.   The plaintiff continued to work into the early 2000s with these issues, at which time she began to experience pain issues with cervical spondylosis and carpal tunnel syndrome, for which she underwent a left-sided release on February 7, 2000, and a right-sided release on December 15, 2001.

The plaintiff's most significant medical problem, from a work perspective, was her erratic blood glucose levels due to her diabetes type 1.   She continued to work throughout this period, eventually attempting to work from home on or about September 24, 2001, in order to have better glucose control.

By February 18, 2002, the plaintiff's cardiologist, Dr. Barry Silverman, recommended that she stop working and be placed on disability due to "increased symptoms, heart and lung disease, diabetes and recurrent syncope."[1]   Claim File [Doc. No. 19-9], p. CL 062.   At this point the plaintiff was tired and dizzy and had

---

[1] Syncope is a loss of consciousness from insufficient blood flow to the brain.

increasing shortness of breath.  The syncopal spells resulted in falls and injuries.  Dr. Silverman began to suspect that her cardiomyopathy of uncertain etiology was possibly diabetic in nature.  He believed that the plaintiff was a complex patient whose multiple problems and resulting medications warranted disability.

### IV.  The Plaintiff Goes On Short-Term Disability

The plaintiff followed Dr. Silverman's recommendation to stop working and applied for short term disability.  MetLife interviewed the plaintiff on February 28, 2002.  In the interview, the plaintiff stated that her wheezing, shortness of breath, and dizziness had grown worse, and that she needed plenty of rest.  On March 15, 2002, MetLife approved her for short term disability based on Dr. Silverman's diagnoses of cardiomyopathy, diabetes mellitus, and asthma.  MetLife's files relating to the approval contained the note "possible permanent disability."  Claim File [Doc. No. 19-7], p. CL 05.

In an Attending Physician Statement completed on or about March 19, 2002, Dr. Silverman listed the plaintiff's diagnosis as cardiomyopathy, diabetes mellitus, wheezing, and syncope.  He recommended that the plaintiff exercise moderately and remain on disability.  On April 22, 2002, Dr. Ernest Beasley, the plaintiff's endocrinologist, noted that her blood sugars remained variable.  Dr. Beasley remarked that the plaintiff remained "mostly homebound"

and had suffered two syncopal spells.  Claim File [Doc. No. 19-27], p. 827.  Dr. Beasley's assessment was diabetic cardiomyopathy; he encouraged tight control of blood sugar, periods of rest, and prohibited unsupervised driving.

Per MetLife's request, Dr. Silverman completed an Attending Physicians' Supplementary Statement on May 18, 2002.  He stated that the plaintiff would not be able to return to work due to diabetic cardiomyopathy.  He listed objective findings to support the conclusion, including an abnormal stress echo, abnormal ECG readings, and global hypokenesis.  In response to an item asking which specific restrictions and limitations prevented the plaintiff from being able to perform her duties, Dr. Silverman responded "dyspnea, unable to drive, needs frequent rest periods, patient has recurrent syncope."  Claim File [Doc. No. 19-8], p. CL 046.

As of July 2002, the plaintiff continued to have breathlessness on exertion, tiredness, lack of energy, and syncopal spells.  Dr. Silverman's records indicate that the plaintiff's fatigue and shortness of breath continued throughout August 2002.

The plaintiff's short-term disability benefits lasted through August 26, 2002 – the maximum duration under the policy.

V.   __The Plaintiff is Approved For LTD Benefits__

In August 2002, the plaintiff's short-term disability case manager submitted her claim for LTD benefits.  The plaintiff responded on August 26, 2002, to a number of questions in a personal profile form provided by MetLife.  When asked to describe her limitations preventing a return to work, she listed diabetes, fatigue, blackouts, sleeping problems, shortness of breath, exhaustion, and asthma.  She stated that her sleeping habits had changed since her conditions began in that she sleeps more and has more sleep disturbances.  In response to a question asking whether there had been any changes in her ability to care for her personal needs and grooming, the plaintiff responded that she could not lift her arms above her head and could not wash or dry her hair without extreme fatigue.  In fact, the plaintiff recounted that she sometimes woke up, took a shower and did her hair only to have to return to bed because of the fatigue.  In response to a question about what types of housework she did, the plaintiff circled "laundry" and "washing dishes", but noted that she has had to hire a maid to clean because she could not exert herself.

As for elective activities, the plaintiff noted that she did not shop anymore because she tried not to drive.  Instead, the plaintiff said she relied on her husband to drive when she needed to leave the house.  As for hobbies and activities, the plaintiff

-7-

stated that she walked when she could, went to the movies, sewed, read, and watched television.  Finally, the plaintiff stated that she exercised a lot less than she used to, but tried to at least keep moving.

Based on her doctors' diagnoses and the questionnaire, MetLife found the plaintiff disabled under the Plan's definition and awarded her LTD benefits beginning August 27, 2002.  On September 5, 2002, MetLife stated in its internal notes that the plaintiff was "an excellent SSDI candidate with her medical conditions." Claim File [Doc. No. 19-7], p. CL 011.  Accordingly, MetLife encouraged the plaintiff to apply for social security disability benefits on September 23, 2002.  The plaintiff had, in fact, already filed for Social Security benefits on June 27, 2002.

In 2003, the plaintiff continued to receive treatment for her multiple health problems.  On August 26, 2003, her pulmonologist, Dr. Daniel Callahan, found that she had a minimal obstructive lung defect.  The airway obstruction was confirmed by the decrease in flow rate at 50% and 75% of the flow volume curve.  Dr. Callahan noted that the plaintiff's asthma was only variably controlled, but had improved.

On August 29, 2003, Dr. Silverman again stated to MetLife that the plaintiff was "permanently disabled."  Claim File [Doc. No. 19-25], p. CL 726.  He did, however, note that the plaintiff was able

-8-

to lift up to 10 pounds with frequency and that she could occasionally lift up to 50 pounds. Dr. Silverman declined to opine on the plaintiff's abilities to sit, stand, and walk, as well as her abilities to perform certain repetitive movements, noting that such indications were "not cardiac related." Id. at CL 727.

The plaintiff's blood sugar fluctuations also continued throughout the year, with a high escalation in Fall 2003. On September 12, 2003, the plaintiff returned to Dr. Silverman because she was having palpitations. He noted that she was taking insulin multiple times a day and was having trouble controlling her diabetes. He noted no new cardiovascular changes in the exam, and suspected that her present problems were related to "wide ranges in blood sugar." Claim File [Doc. No. 19-14], p. CL 286. Dr. Silverman also noted that the plaintiff's pulmonary medications contributed to her arrthymias. He asked the plaintiff to see Dr. Beasley to get better control of her blood sugar.

On November 7, 2003, Dr. Silverman again examined the plaintiff, who was on crutches at the time. He noted that she had been having problems with exertional breathlessness and occasional palpitations, but no sustained tachycardias or angina. She had not had any recent syncopal spells. Dr. Silverman observed that the plaintiff was having "multiple problems related to her diabetic control, possibly related to steroid joint injections which she had

-9-

in both her knees and her shoulder." Claim File [Doc. No. 19-14], p. CL 283.

Previous to and around this time period, the plaintiff began to suffer from multiple other problems including: cervical spondylosis; right and left carpal tunnel syndrome which resulted in two releases being performed; DeQuervain's syndrome, which also resulted in releases being performed; foot pain resulting in surgery; gout controlled by medication; shoulder bursitis; an annular fibrosis tear; a posterior annular fiber tear; L5-S1 with radicular symptoms; fibromyalgia; bladder problems resulting in surgery; sinusitis resulting in surgery; and ear problems resulting in surgery. Despite all of these problems, however, the most significant problem contributing to her disability was fatigue caused by cardiomyopathy and diabetes.

The plaintiff visited Dr. Beasley on January 4, 2004. In his notes, he observed "BS [blood sugars] are variable; other than cardiovascular issues she is doing fair." Claim File [Doc. No. 19-14], p. CL 297.

On January 26, 2004, a MetLife representative conducted a telephone interview with the plaintiff. When asked what was keeping her from returning to work, the plaintiff stated that she had heart failure in 1994 which had been controlled since that time by medications and avoiding stress. The plaintiff stated that she

had fibromyalgia and problems with fatigue.  In fact, the plaintiff
noted that she sometimes slept for periods of 20 hours at a time.
Finally, the plaintiff noted that she needed to see three doctors
a week and could not do that and work at the same time.

The MetLife representative then asked the plaintiff to
describe her daily activity tolerance.  The plaintiff responded
that she could walk to the mailbox or up to a mile on a flat road.
She noted that any incline or stairs caused shortness of breath and
dizziness.  The plaintiff stated that she had hired a maid service
because she was unable to do housework.

Upon discussion with the case manager, the MetLife
representative concluded as follows:

> Review of medical documentation and interview with ee
> [employee] supports ee's inability to perform job
> functions of Global Accounts Rep and disability until
> 7/03 [appears to be a typographical error; should read
> 7/04] due to nerve blocks for back pain, recent elbow and
> wrist surgery and recent foot surgery, unable to use
> keyboard for sustained period, and unable to travel with
> back pain tx injections.
>
> Suggest review in 7/04 for update, suggest obtain recent
> ov notes from cardiology, rheumatology, ortho, pulmonary,
> and endocrine to determine status of all health issues,
> as at this time cardiac function appears to be stable and
> is apparently not the primary issue limiting [return to
> work].

Claim File [Doc. No. 19-17], p. CL 017.

On February 27, 2004, the plaintiff saw Dr. Silverman for new
problems with dyspnea.  Dr. Silverman's notes read "[t]his is a

-11-

patient with multiple risk factors and new symptoms of breathlessness and orthopnea [breathlessness when lying flat]." Claim File [Doc. No. 19-15], p. 322-23. Dr. Silverman ordered a nuclear scan to detect whether these issues indicated a new vascular problem. The nuclear testing results were normal.

## VI.  __The Plaintiff is Ruled Eligible for Social Security Disability Benefits__

On March 17, 2004, an administrative law judge (ALJ) for the Social Security Administration issued a finding that the plaintiff was entitled to Social Security disability benefits. The plaintiff had alleged disabilities due to diabetes mellitus, asthma, and cardiomyopathy. The ALJ considered assessments from two state-affiliated doctors, Phillip Gertler and B. Waldo Moore, who had reviewed the medical evidence. These doctors opined that the plaintiff could perform only a limited range of light work. The ALJ accepted as credible the plaintiff's testimony that her impairments necessitated rest during the day, as well as Dr. Silverman's indication that the fatigue was a result of her impairments. Dr. Silverman noted that the plaintiff had a reduced ejection fraction (the amount of blood pumped out of a ventricle with each heart beat).

Additionally, the ALJ credited the testimony of a vocational expert, who opined that the plaintiff could not perform her past

job duties due to the need for rest breaks during the day.  The
vocational expert also assessed the plaintiff's future employment
potential pursuant to the Social Security Administration's Medical-
Vocational Rules, and found, given the plaintiff's age (43),
education (high school), and work experience, that no jobs would be
available for the plaintiff.  The ALJ agreed with this opinion.

    In light of the above, the ALJ made the following findings in
his order:

> 1.  The claimant meets the non-disability
>     requirements set forth in § 216(I) of the
>     Social Security Act and is insured for
>     benefits as of the established onset date.
>
> 2.  The claimant has not engaged in substantial
>     gainful activity since February 18, 2002.
>
> 3.  The medical evidence establishes that the
>     claimant has the following "severe"
>     impairments": diabetes mellitus, asthma, and
>     cardiomyopathy [sic].
>
> 4.  The claimant has no impairment that meets or
>     equals the criteria of any impairment listed
>     in Appendix 1, Subpart P, Regulations No. 4.
>
> 5.  The claimant's assertions concerning her
>     ability to work are credible.
>
> 6.  The claimant retains the residual functional
>     capacity for less than a full range of light
>     work with a necessity for up to four rest
>     periods during the work day.
>
> 7.  The claimant is unable to perform the
>     requirements of her past relevant work.

8.   On February 18, 2002, the claimant was a younger individual age 18-44.

9.   The claimant has a high school education.

10.   The claimant has a skilled work background.

11.   Considering the claimant's additional limitations, she cannot make any adjustment to any work that exists in significant numbers in the national economy; a finding of disabled is therefore reached within the framework of Medical-Vocational Rule 202.21.

12.   The claimant has been under a disability, as defined by the Social Security Act, since February 18, 2002 (20 CAR § 404.1520(f)).

It is the decision of the Administrative Law Judge that, based on the application filed on June 27, 2002, the claimant is entitled to a period of disability commencing February 18, 2002, and to Disability Insurance Benefits under §§ 216(I) and 223, respectively, of the Social Security Act.

Claim File [Doc. No. 19-26], pp. 776-77.

On September 3, 2004, Dr. Beasley again noted that the plaintiff's blood sugars were variable. Two weeks later, on September 17, Dr. Silverman filled out another Attending Physician's Statement opining that the plaintiff could work zero hours per day. He also noted that she had increased shortness of breath recently. Finally, in response to an item inquiring whether he expected improvement in any area, Dr. Silverman stated that he did not because the conditions were chronic.

-14-

### VI.  **MetLife Reconsiders the Plaintiff's LTD Eligibility**

In February 2005, MetLife began the process of reevaluating the plaintiff's eligibility for LTD benefits.  As part of that process, it sent out requests for information to the plaintiff's treating physicians and had the plaintiff's file reviewed by a independent consulting physician.

In response to MetLife's request, Dr. John Goldman, the plaintiff's rheumatologist, provided an office visit note dated July 1, 2004.  Dr. Goldman reported that the plaintiff's neck, knees, ankles, shoulders, elbows, wrists, hips, and feet all had "full range of motion," and that she had been working in the yard planting azaleas.  Claim File [Doc. No. 19-21], pp. CL 646-47.  Dr. Goldman did note, however, that the plaintiff had high blood sugar and was planning to have a transplant.  Dr. Goldman also stated that the plaintiff had "severe fatigue."  Id. at CL 646.

Another treating physician, Edward Hollinger (the plaintiff's orthopedic surgeon), responded to MetLife's inquiry on February 16, 2005.  Dr. Hollinger had previously treated the plaintiff for lateral epicondylitis (tennis elbow), including performing a procedure called topaz coblation microdebridement on the elbow.  Dr. Hollinger noted on the response form that the condition was not work related.  Dr. Hollinger indicated that the plaintiff was not currently able to perform repetitive fine finger movements, but

-15-

responded that he had advised the plaintiff she could return to work by February 7, 2005.

MetLife also presented the plaintiff's medical file to Kevin Smith, D.O. (board certified in preventive medicine and occupational medicine), for an independent review.  He did not examine the plaintiff.   Dr. Smith submitted his conclusions on February 16, 2005.  He opined that:

> The medical records do not indicate objective clinical evidence on examination or testing, functional impairments or treatment intensity or frequency of a severity that preclude gainful employment at this time. She has mild cardiomyopathy which is stable.  She exercises on a regular basis, has a well-maintained ejection fraction and a reasonably good exercise capacity.  There is no evidence of significant coronary artery disease.  Her asthma is stable on medications as is her gout and fibromyalgia according to the medical records . . . .
>
> The medical records are consistent with her abilities to work within a sedentary to light work capacity level. Specifically, she is able to sit 8 hours out of an 8-hour day.  She could stand and walk for up to 10 minutes at a time but should not exceed more than 1 hour of standing and walking in an 8-hour day.  She could occasionally lift and carry up to 20 lb and more frequently up to [10] lb.  She should not climb ladders or assume cramped or unusual positions.  She previously worked as a global accounts administrator and would be able to work at a similar administrative job.

Claim File [Doc. No. 19-20], p. CL 596.

### VII. __MetLife Terminates the Plaintiff's Benefits__

By a letter dated February 21, 2005, MetLife advised the plaintiff that her LTD benefits were terminated as of February 18,

2005.  MetLife explained:

> The medical records from Dr. Goldman indicate that you have complaints of pain but upon your physical examination there [were] no findings provided that support your inability to perform your normal occupation.
>
> The medical records from Dr. Silverman were reviewed . . . . Dr. Silverman indicate[d] that you have blurred vision and sinus problems.  You have some joint and muscle pains, and you have been treated for fibromyalgia.  Upon medical examination, there [were] no significant findings provided.  Dr. Silverman's assessment [was] that you are clinically stable in regards to your cardiac condition . . . .
>
> You were referred to a nuclear scan to verify if you had a vascular problem . . . on March [3], 2004.  The results of the nuclear scan show a probably normal perfusion and an ejection fraction level at 50-55%, which is within normal range.  The results from the nuclear scan indicate a low probability for hemodynamically significant coronary artery disease.
>
> *   *   *
>
> The above medical documentation was referred to our Independent Physician Consultant (IPC), . . . Dr. Kevin Smith, D.O. . . . Dr. Smith reviewed all medical documentation available from Dr. Goldman and Dr. Silverman.  Dr. Smith verifies that your cardiac and pulmonary conditions are both stable.  Your rheumatic conditions of fibromyalgia and gout are also stable.  Your diabetes is under reasonable control and is not severe enough that it would prevent you from returning to work at any occupation.  Dr. Smith verifies that based on the available medical documentation, you would be able to perform a sedentary, sit-down position, with standing and walking up to ten minutes at a time.
>
> The medical documentation from Dr. Hollinger was reviewed last . . . . Dr. Hollinger notes that you are a good candidate to start exercise and will have to avoid rapid repetitive motion and heavy gripping . . . .

> Since the medical documentation provided indicates you
> are capable of working a sedentary position, you are not
> considered totally disabled from any occupation.  Since
> you are not considered totally disabled from any
> occupation, your Long-Term Disability Claim has been
> terminated as of February 18, 2005.

Claim File [Doc. No. 19-21] at CL 619-20.  MetLife also made

reference in the letter to a statement by Dr. Hollinger that the

plaintiff had "biked" the day before.  Id.

**VII.** **The Plaintiff's First Appeal**

The plaintiff appealed MetLife's decision by letter dated

March 31, 2005.  She argued that Social Security had found her

disabled and that her diabetes was not under control.  The

plaintiff's medical records from April 19, 2005, indeed indicate

that her diabetes was "in poor control" despite the plaintiff's

efforts.  Claim File [Doc. No. 19-21], p. CL 613.  On May 17, 2005,

Dr. Silverman submitted a letter to MetLife stating that the

plaintiff had "diabetes, asthma and cardiomyopathy.  Patient has

fatigue, poor exercise tolerance and **cannot work**."  Id. at CL 605

(emphasis added).  The plaintiff also submitted additional lab

results to MetLife.

As part of the appeals process, MetLife submitted the

plaintiff's file to a cardiologist, Dr. Ashok Patel.  He noted that

the plaintiff had "no evidence of perfusion abnormality on thallium

scan suggestive of any coronary artery disease" and that her

-18-

"ejection fraction by thallium scan was reported as 50-55% . . . ."
Claim File [Doc. No. 19-20], p. CL 581. Id.  In sum, Dr. Patel
agreed that the plaintiff had cardiomyopathy but stated that "there
was no objective data to suggest functional limitations." Id. Dr.
Patel did not examine the plaintiff.

Another physician, J.W. Rodgers (board certified in internal
and pulmonary medicine), reviewed the plaintiff's file on June 22,
2005.   Dr. Rodgers did not examine the plaintiff.   After
summarizing the plaintiff's medical history from 2002 onward, Dr.
Rodgers concluded as follows:

> At this point, there is little in this file which would
> indicate that this patient is incapable of sedentary
> levels of activity either from a cardiovascular
> standpoint, from a rheumatologic standpoint (note that
> the rheumatologic evaluation failed to reveal any
> substantial joint abnormalities), or from a pulmonary
> standpoint (note that the pulmonary function studies were
> normal and only intermittently has the patient had
> wheezing related possibly to acute upper respiratory
> tract infections).

Id. at CL 578.

Finally, John D. Thomas II, M.D. (board certified in Physical
Medicine and Rehabilitation), performed a third review of the
plaintiff's medical files on June 30, 2005.  Dr. Thomas confined
his review to neuromusculoskeletal issues.  He remarked that the
plaintiff's gout was well controlled and that she had recovered
well from her elbow surgery.  Based on his review, which did not

-19-

include an examination of the plaintiff, Dr. Thomas opined that the plaintiff "displays full-time physical ability/work capacity in a light duty range.  She would have to be careful of specified tasks and positions as per Dr. Hollinger." Id. at CL 583.

Based on the opinions of these three reviewers, MetLife upheld its decision to terminate benefits by a letter dated July 11, 2005.  In the letter MetLife explained, "In an effort to provide you with a full and fair review, your file was referred to Independent Physician Consultants Board Certified in Internal/Pulmonary Medicine, Cardiology, Occupational Medicine, and Physical Medicine and Rehabilitation." Id. at 586.  MetLife summarized the opinions of the physician consultants, and concluded: "In summary, it is determined that you are capable of performing at a sedentary to light duty capacity and therefore, are not totally disabled as defined in your group plan. Therefore, we find our original decision to terminate benefits is appropriate." Id. at 587.

### IX.  The Plaintiff Asks MetLife to Reconsider

Following the denial of her appeal, the plaintiff retained an attorney, who requested that MetLife reconsider its decision via a letter dated January 3, 2006.  Along with the letter, the plaintiff's attorney submitted extensive medical, laboratory, and pharmacy records along with a treating physician questionnaire

completed by Dr. Silverman on September 25, 2005.   In the questionnaire, Dr. Silverman listed a diagnosis of cardiomyopathy and diabetes, with symptoms of fatigue and general malaise.   Dr. Silverman indicated that the plaintiff's impairments were consistent with the symptoms of functional limitations described in his evaluation.   He stated that the plaintiff "frequently" experienced symptoms severe enough to interfere with attention and concentration.   Claim File [Doc. No. 19-12], p. CL 153.   He also indicated that the plaintiff was "incapable of even 'low stress' jobs."   Id.

Dr. Silverman also commented on the side effects of the plaintiff's medications.   He noted that the medications themselves could be expected to cause dizziness, fatigue, and difficulty with concentration.

Dr. Silverman declined to quantify the plaintiff's abilities to sit, stand, or walk for periods of time during a workday, noting that he is not an occupational physician.   He did, however, note that the plaintiff would need to take unscheduled breaks, including periods of lying down, and to elevate her feet when sitting for prolonged periods.   In response to the question "Given your objective findings and clinical examination of Ms. Johnson, do you believe that she would be able to maintain and sustain gainful employment (8 hours per pay, 40 hours per week) in any

-21-

capacity?", Dr. Silverman responded "No."  Claim File [Doc. No. 19-12], p. CL 155.  The questionnaire concludes,

> Even assuming, hypothetically, that Ms. Johnson has the ability to resume some form of light or sedentary work, would the symptoms associated with her conditions and/or side effects from her medication cause her to miss at least 3-4 days of work per month?

Dr. Silverman responded "Yes."  <u>Id.</u>

Although not required to do so by ERISA or the terms of the LTD Plan, MetLife re-opened the plaintiff's claim and voluntarily permitted a second appeal.  MetLife forwarded the additional documentation submitted by the plaintiff's counsel to the same panel of independent physician consultants for further review and opinions.

Dr. Patel, the cardiologist, reviewed the new medical information on January 21, 2006.  He extensively summarized the additional information, noting that Dr. Silverman had assessed the plaintiff as having "moderate to severe mitral regurgitation with reduced left ventricular ejection fraction."  Claim File [Doc. No. 19-11], p. CL 124.  He recounted Dr. Silverman's finding that the plaintiff "also has poor diabetic control and has significant valvular disease and significant myocardial disease.  It was felt that her mitral regurgitation was getting significantly worse."  <u>Id.</u>

-22-

In response to the review form's question whether the medical information supported the plaintiff's claimed functional limitations, Dr. Patel concluded that he was "unable to comment at the present time due to lack of available data." Id.  He did note, however, that Dr. Silverman's diagnosis of worsening mitral valve indicated that the plaintiff "has significant decompensation in her exercise/capacity." Id.  Dr. Patel stated that he was unable to comment on the plaintiff's functional capacity without a new series of tests to measure the plaintiff's cardiomyopathy.

Dr. Rodgers, the internist/pulmonologist, reexamined the plaintiff's file on January 26, 2006.  He noted that the new information almost exclusively focused on the plaintiff's diabetes, which he characterized as "difficult to control." Claim File [Doc. No. 19-11], p. CL 127.  Because the records dealt primarily with the plaintiff's diabetes, Dr. Rodgers concluded "that from a pulmonary standpoint there is nothing in this file which would once again indicate that this patient is incapable of sedentary to light levels of activity." Id. at 128.

Finally, Dr. Thomas, the physical medicine and rehabilitation specialist, conducted a review of the additional records on January 27, 2006.  He provided an extensive and detailed chronology of the plaintiff's neuromusculoskeletal issues.  Dr. Thomas responded to

a question asking him to detail any objective, clinical findings and data supporting a finding of functional limitations as follows:

> . . . speaking as a Board Certified Practitioner in Physical Medicine and Rehabilitation with added qualifications in Pain Management . . . there is evidence for significant clinical problems and issues throughout my review. Ms. Johnson has C-spine pathology, LS-spine pathology, gout, Fibromyalgia Syndrome, status post right wrist release for DeQuervain's, status post carpal tunnel release bilaterally, status post lateral epicondylar release bilaterally, etc. On top of all this, she has multiple other clinical/medical issues requiring ongoing care activities. The file notes a steady set of examinations performed by a variety of neuromusculoskeletal specialist[s], all containing findings supporting the use of medications, bracing, therapy, indications for surgery, etc. All of this supports the notion of restrictions and limitations. The assignments/allowances of Dr. Hollin[g]er, 12/16/05, are clinically reasonable, in my opinion.

Claim File [Doc. No. 19-11], p. CL 110-11. Based on the plaintiff's latest records from Dr. Hollinger, which indicated that the plaintiff was doing "rather well overall," Dr. Thomas noted:

> Therefore, in summary, as of 02/07/05 and documented in a 02/16/05 MetLife Attending Physician Statement from Dr. Hollin[g]er, Ms. Johnson has light duty physical capacity/abilities with a few restrictions and limitations such as no climbing, no repetitive grasping, no repetitive fine fingering, and no push and pull.

Id. at CL 110.

Relying on the revised reports by Drs. Patel, Rodgers, and Thomas, MetLife upheld its termination of the plaintiff's benefits via a letter on February 7, 2006.

-24-

## X.    **The Plaintiff Files Suit**

On November 22, 2006, the plaintiff filed a lawsuit pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover her benefits under the Cingular LTD plan [Doc. No. 1].  The plaintiff claims that she is disabled from all gainful occupations. MetLife filed a motion for summary judgment on October 11, 2007 [Doc. No. 19].  That motion is now before the court for a ruling.

## **LEGAL ANALYSIS**

## I.    **Standard of Review**

### A.    Summary Judgment Standard

Summary judgment is proper when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The movant carries the initial burden and must show the court that there is "an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  "Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, depositions, admissions and the like, designating

-25-

"specific facts showing that there is a genuine issue for trial."
Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  Id.

   B.   ERISA Burden of Proof

   ERISA itself provides no standard for reviewing decisions of plan administrators or fiduciaries.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989).  But the Eleventh Circuit has read Firestone to have established three distinct standards for reviewing administrators' plan decisions: "(1) de novo where the plan does not grant the administrator discretion [i.e., does not exercise discretion in deciding claims]; (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] . . . [it has] . . . a conflict of interest."  Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132, 1134 (11th Cir. 2004).

   Because the distinctions between these three standards can be difficult to discern, the Eleventh Circuit in Williams incorporated

-26-

the three levels of review into a multi-step approach for reviewing
ERISA-plan benefit denials:

> (1) Apply the de novo standard to determine whether the
> claim administrator's benefits-denial decision is
> "wrong" (i.e., the court disagrees with the
> administrator's decision); if it is not, then end
> the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "de novo
> wrong," then determine whether it was vested with
> discretion in reviewing claims; if not, end
> judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "de novo wrong"
> and he was vested with discretion in reviewing
> claims, then determine whether "reasonable" grounds
> supported it (hence, review its decision under the
> more deferential arbitrary and capricious
> standard).

> (4) If no reasonable grounds exist, then end the
> inquiry and reverse the administrator's decision;
> if reasonable grounds do exist, then determine if
> it operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and
> affirm the decision.

(6) If there is a conflict of interest, then apply
heightened arbitrary and capricious review to the
decision to affirm or deny it.

Id. at 1137-38.

**II.    <u>Application</u>**

A.    <u>The Decision to Deny Benefits was De Novo Wrong</u>

Dr. Silverman, the plaintiff's primary treating physician, who
has no stake in the outcome of the case, reached the opinion that
the plaintiff was disabled based on his numerous examinations of
her since at least August 1997.  MetLife's doctors, on the other
hand, never examined the plaintiff.  They reached their conclusion
that the plaintiff was not disabled based merely on their review of
the plaintiff's records – "accurate, but incomplete information."
<u>Finazzi v. Paul Revere Life Insurance Company/Unum Provident Corp.</u>,
327 F. Supp. 2d 790, 795 (W.D. Mich. 2004).  It is primarily for
this reason that the court finds that MetLife's decision to
terminate the plaintiff's benefits was de novo wrong.

The Supreme Court has held that plan administrators are not
required to accord special deference to the opinions of treating
physicians.  <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822,
825 (2003).  Plan administrators may not, however, "arbitrarily
refuse to credit a claimant's reliable evidence, including the
opinions of a treating physician."  <u>Id.</u> at 834.  The Court has

-28-

recognized that "treating physicians, as a rule, have a greater opportunity than consultants to know and observe the patient as an individual." Id. at 832.    While Nord makes it clear that this court is not required to adopt a per se rule to treat physicians' opinions with more weight, "[c]ommon sense and a stream of legal precedent suggest, however, factual determinations of a treating physician *are* objectively more reliable." Burt v. Metropolitan Life Insurance Co., No. 1:04-CV-2376-BBM, 2005 U.S. Dist. LEXIS 22810, at *33 (N.D. Ga. Sept. 16, 2005) (emphasis in original); see also Finazzi, 327 F. Supp. 2d at 795-96.

### 1.   *MetLife's Specific Arguments*

Arguing that its decision was de novo correct, MetLife states that Dr. Silverman failed to provide objective medical evidence that the plaintiff satisfied the definition of "disabled."   In particular, it notes that Dr. Silverman, while reaching the overall conclusion that the plaintiff was unable to work, did not respond to the sections of its form requesting him to note the plaintiff's restrictions on sedentary work activities such as sitting, standing, or walking.   While it is true that Dr. Silverman wrote "not cardiac related" on the section of the MetLife form titled "Physical Capabilities," a closer examination of the forms makes it readily apparent why he did this: MetLife's forms contain a separate section entitled Cardiac Functional Capacity.   See Claim

-29-

File [Doc. No. 19-25], at CL 727 and 744.  As this section was more specifically related to Dr. Silverman's opinion as a cardiologist, MetLife cannot now complain that Dr. Silverman's failure to fill out one section of its own poorly-designed form somehow indicates a lack of objective evidence for his conclusions.

MetLife also points out that neither of the plaintiff's other treating physicians who responded to its requests for information – Dr. Goldman, a rheumatologist, and Dr. Hollinger, an orthopaedic surgeon – indicated that she was disabled.  This does not show that MetLife's decision to deny benefits was correct, however, as these doctors' opinions were not related to the conditions which allegedly caused the plaintiff's disability – fatigue and shortness of breath related to cardiomyopathy, diabetes type 1, and asthma. None of these conditions are rheumatological or orthopaedic issues; accordingly, these doctor's opinions – especially Dr. Hollinger's, which related only to the plaintiff's tennis elbow – are of minimal relevance.

Likewise, to the extent MetLife's consulting physicians relied on information relating to conditions outside of the plaintiff's core trio of debilitating conditions to render their opinions regarding the plaintiff's disability status, those opinions are of minimal relevance.  For example, the opinions of Dr. Thomas, the physical medicine and rehabilitation specialist, focused solely on

"neuromusculoskeletal issues" and not the issues relevant to the plaintiff's disability arguments. If Dr. Thomas's opinions have any relevance at all, it is that they reveal the extent to which the plaintiff's secondary medical issues compounded her primary problems: Dr. Thomas's second review of the plaintiff's medical information includes the following litany of neuromusculoskeletal issues: "C-spine pathology, LS-spine pathology, gout, Fibromyalgia Syndrome, status post right wrist release for DeQuervain's, status post carpal tunnel release bilaterally, status post lateral epicondylar release bilaterally, etc." Claim File [Doc. No. 19-11], p. CL 110-11.

Next, MetLife argues that the plaintiff's self-reported personal activities contradict Dr. Silverman's opinion that the plaintiff had no capacity for work. Among the activities reported by the plaintiff were household chores, running errands, minimal exercise, gardening, reading, learning photography, and sewing. MetLife also notes that Dr. Goldman had reported that the plaintiff had callouses on her hands from planting bushes and that Dr. Hollinger had related that the plaintiff had been "biking."

MetLife's assertions make use of a highly selective parsing of the plaintiff's statements. For instance, in the plaintiff's most recent self-report, she stated that she had been forced to hire a maid to clean since her condition has deteriorated, that she runs

-31-

errands occasionally, only when she "feel[s] ok," that she gardens if possible, that she doesn't normally shop, and that she exercises only two hours per week.  Claim File [Doc. No. 19-22], at CL 652-58.  As for the plaintiff's "biking," MetLife's argument is misleading at best; the record shows that the plaintiff rides a *motorcycle* – not a bicycle.  Finally, as for the plaintiff's planting bushes, MetLife fails to mention that this activity occurred during a period during which MetLife does not dispute the plaintiff was disabled under the definition of the Plan.

Moreover, the majority of courts to have addressed the issue has held that performing household activities does not translate into the ability to perform work.  See, e.g., Hawkins v. First Union Corp.Long-Term Disability Plan, 326 F.3d 914, 918 (7th Cir. 2003) (claimant's ability to do some activities at home did not establish that he could do a full time job); Thivierge v. Hartford Life & Accident Insurance Co., No. C 05-0163 CW, 2006 U.S. Dist. LEXIS 25216, at *34-36 (N.D. Cal. Mar. 28, 2006)(good days and bad days prevent consistent work); Black v. Jefferson Pilot Financial Co., No. 4:05CV-019-M, 2006 U.S. Dist. LEXIS 1186, at *10 (W.D. Ky. Jan. 12, 2006) ("Jefferson Pilot's contention that 'if a fellow can hike the woods in pursuit of the elusive wild turkey he can surely do some kind of work' fails to consider the entire question" of whether someone can maintain work and earn a salary); Hillock v.

Continental Casualty Co., No. 02-C-5126, 2004 U.S. Dist. LEXIS 3907, at *20 (N.D. Ill. Mar. 1, 2004) ("CNA also assumed that the ability to do some activities at home by itself shows that a claimant can perform the material duties of her job. This assumption is not supported by case law or common sense."). The Eleventh Circuit has held, in the Social Security context, that "participation in everyday activities of short duration such as housework or fishing" does not disqualify a claimant from disability and does not establish that a claimant can perform sedentary work. Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997). Accordingly, the court finds that the plaintiff's self-reported personal activities do not contradict a finding that she is disabled under the definition of the Plan.

MetLife creatively attempts to construe the opinion of the Social Security Administrative Law Judge ("ALJ") – which was in the plaintiff's favor – as somehow supporting its arguments that the plaintiff is *not* disabled. It bases this argument on a statement in that opinion declaring that the plaintiff retained the functional capacity to perform a limited range of light duty work. Social Security decisions granting disability benefits are not dispositive in ERISA cases. Whatley v. CNA Insurance Cos., 189 F.3d 1310, 1314 n.8 (11th Cir. 1999). The court may, however

consider this information in its review of an administrator's determination of benefits in an ERISA case.  Id.

Here, the ALJ's opinion clearly supports the plaintiff's contention that she is disabled.  The opinion represented a finding by an independent fact-finder that in light of the plaintiff's physical limitations, there were no jobs that she could perform given her age, education, and work experience – virtually the same disability definition that the plaintiff must prove in this case. The ALJ had the benefit of observing the plaintiff and accepted her testimony concerning her fatigue as credible.  The ALJ likewise accepted the opinion of an independent vocational expert that a person with the plaintiff's level of fatigue would need to take rest breaks during the day and would not be able to perform any jobs.  The ALJ's opinion thus weighs heavily in the plaintiff's favor for the court's analysis of ERISA issues.

Finally, MetLife argues that "substantiating objective medical evidence" was "specifically required" by the Plan.  MetLife cites Ecklund v. Continental Casualty Co., 415 F. Supp. 2d 1353 (N.D. Ala. 2005), in support of that assertion.  Ecklund is distinguishable in two important ways, however.  First, the plaintiff in that case complained of fibromyalgia and chronic fatigue syndrome.  Both of those conditions are diagnosed based almost entirely on the patient's self-reporting of symptoms and

have unknown causes.  By contrast, here, the plaintiff suffers from cardiomyopathy, diabetes, and asthma.  None of MetLife's physician consultants dispute that the plaintiff has these conditions or that both cardiomyopathy and diabetes cause fatigue, the plaintiff's primary disabling symptom.

Second, the disability policy in <u>Eklund</u> specifically required that the claimant submit objective proof of disability, stating:

> Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for your disabling conditions.

<u>Id.</u> at 1356.  The <u>Eklund</u> court found that no such evidence was submitted.

Here, however, the Cingular Wireless Plan does not appear to contain an objective medical evidence requirement.  The only reference to objective medical evidence is in the Summary Plan Description ("SPD"), which does not define or explain the term. The language of the SPD is not binding because the SPD explicitly provides that, in any conflict between the Plan and the SPD, the Plan controls.  SPD [Doc. No. 19, Ex. 2], at 3.  Moreover, a plan administrator cannot deny a claim for long-term disability benefits based on "lack of objective medical evidence" when the plan does not refer to the objective medical evidence standard or define that term.  See <u>Durr v. Metropolitan Life Insurance Co.</u>, 15 F. Supp. 2d

205, 212-13 (D. Conn. 1998); see also Burt, 2005 U.S. Dist. LEXIS 22810, at *25-27 (rejecting an argument by MetLife that its plan had an "objective proof" requirement where the only support for the argument was provisions in the SPD requiring the claimant to submit "proof" or "evidence" or "other material information," but where the plan itself contained no mention of such a requirement).

    2.   *Weighing the Overall Evidence*

Having rejected the specific MetLife arguments discussed above, the court is left to compare the opinions of the plaintiff's treating physicians with those of Metlife's consulting physicians as they relate to the conditions the plaintiff claimed caused her disability.

Dr. Silverman repeatedly opined to MetLife that the plaintiff was unable to perform any work.  He identified the causes of the plaintiff's disability as cardiomyopathy, diabetes mellitus, asthma, and syncope.  The plaintiff's treating physicians provided extensive clinical evidence of these underlying issues, including the following:

- abnormal stress echo;

- abnormal ECG readings showing reduced ejection fraction, mild left ventricular dysfunction, mild to moderate mitral regurgitation, and global hypokenesis;

- widely varying blood sugar levels;

-36-

- an airway obstruction confirmed by a decrease in flow rate at
  50% and 75% of the flow volume curve.

These objective measurements do not, in themselves, establish that the plaintiff was disabled under the Plan; the plaintiff does not argue that they do.   These objective indicators do, however, provide ample evidence for the legitimacy of the symptoms described by the plaintiff's physicians, based on their examinations and interviews, which ultimately render the plaintiff unable to work: extreme fatigue, shortness of breath, inability to concentrate, wheezing, and syncopal spells.

On top of the conditions of diabetes, cardiomyopathy, and asthma, which are the primary causes of the plaintiff's debilitating symptoms, the plaintiff's physicians documented that she suffered from a host of other medical conditions, including:

- cervical spondylosis;

- right and left carpal tunnel syndrome, requiring two release
  procedures;

- DeQuervain's syndrome, which also necessitated release
  procedures;

- foot pain resulting in surgery;

- gout controlled by medication;

- shoulder bursitis;

- an annular fibrosis tear;

-37-

- a posterior annular fiber tear;

- L5-S1 with radicular symptoms;

- fibromyalgia;

- bladder problems resulting in surgery;

- sinusitis resulting in surgery;

- ear problems resulting in surgery.

These problems alone are significant enough in combination that they may have been sufficient to render the plaintiff disabled: as demonstrated by the plaintiff in Eklund, fibromyalgia alone can cause enough discomfort to severely limit an individual's capacity to work.  What is nonetheless clear is that if one begins with the debilitating symptoms of the plaintiff's primary health issues, then adds on the symptoms of these secondary health issues, some of which are seriously debilitating in their own right, and finally tacks on the side-effects of the innumerable medications the plaintiff was required to take daily, it is not at all difficult to imagine why Dr. Silverman reached the conclusion that the plaintiff was totally unable to work.

On the other hand are the opinions of the MetLife consultants. None of these physicians disputed the diagnoses of the plaintiff's treating physicians, nor did they dispute that the plaintiff's underlying conditions can cause the debilitating symptoms she complains of.  More importantly, the MetLife consultants **never**

***examined, or even spoke to, the plaintiff***.  Rather, they based
their conclusions solely on the records available to them, placing
significant weight on the fact that Dr. Silverman declined to fill
out the section of the MetLife form relating to functional
restrictions.  Moreover, each of MetLife's peer review physicians,
with the exception of Dr. Smith, who did not have the benefit of
the plaintiff's entire medical file, seems to have given their
opinion based primarily on an isolated view of the symptoms related
to their specialties – cardiology, pulmonology, and occupational
medicine.  It is not clear that any of the physicians consulted on
the plaintiff's appeal attempted to assess the plaintiff's ability
to work based on the "big picture" combination of effects from the
plaintiff's primary and secondary health issues and medications.
Instead, the consulting physicians' opinions that the plaintiff was
able to perform some sedentary work were based on what was, at
best, an incomplete picture of the plaintiff's overall health
situation.

     In sum, the record is replete with objective, clinical,
evidence that the plaintiff suffers from cardiomyopathy, diabetes,
and asthma – conditions known to cause the symptoms the plaintiff
complained of to her physicians.  The plaintiff also suffered from
a host of documented secondary health issues and medication side-
effects, which compounded her symptoms from the primary conditions.

-39-

An independent fact-finder, the Social Security ALJ, found that the plaintiff was fully disabled under a definition of disability very similar to the one used by the Plan.  All that MetLife can offer to counter this evidence are the opinions of medical consultants who never examined the plaintiff along with an off-handed phrase from the ALJ's opinion that the plaintiff was capable of "less than a full range of light work."  Weighing this evidence, the court concludes that MetLife's decision to terminate the plaintiff's LTD coverage was de novo wrong.

### B.   MetLife Was Vested With Discretion in Reviewing Claims

MetLife concedes that it was vested with discretion to review the plaintiff's claim under the Plan.  The court will therefore move onto the next step of the Williams analysis and determine whether MetLife's decision was supported by "reasonable grounds."

### C.   MetLife's Decision Was Supported by Reasonable Grounds

The court conducts this stage of the Williams analysis by applying a "more deferential arbitrary and capricious standard." 373 F.3d at 1137-38.  Here, MetLife's decision to deny the plaintiff's disability claim was not arbitrary; it was based on the opinions of four separate peer review physicians based on two rounds of review of the plaintiff's medical records.  Thus, even though the court has determined that MetLife's decision was *wrong*,

upon applying a deferential reasonableness standard, it cannot say that the decision was unreasonable as a matter of law.

**D.  MetLife Operated Under a Conflict of Interest**

In most cases where a company both administers and funds a plan, a conflict of interest arises, thus triggering heightened arbitrary and capricious review.  Williams, 373 F.3d at 1135. Here, MetLife both funded and administered the Plan, which dictates that the court apply the "heightened" arbitrary and capricious standard.  MetLife does not appear to contest that this standard applies.

**E.  The Decision Was Tainted by Self-Interest**

**1.  *Arbitrary and Capricious Standard***

Because MetLife is conflicted, Williams requires that the court re-examine the reasonableness of MetLife's decision under a "heightened" arbitrary and capricious standard, but does not spell out exactly what this entails.  Id.  What is clear is that at this point of the analysis, the burden shifts to the plan administrator to prove its decision was not tainted by self-interest.  Potter v. Liberty Life Assurance Co. of Boston, 132 Fed. Appx. 253, 260 (11th Cir. 2005).  As the moving party with the burden of proof, MetLife must affirmatively show the absence of a genuine issue of material fact, supporting its motion with credible evidence that would entitle it to a directed verdict at trial.  United States v. Four

-41-

Parcels of Real Property in Greene and Tuscaloosa Counties in State of Alabama, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc).

The outcome of this case hinges on factual determinations; unfortunately, it is somewhat unclear under existing Eleventh Circuit authority whether the arbitrary and capricious burden shifting approach applies to factual, as well as legal, determinations. See Burt, 2005 U.S. Dist. LEXIS, at *36-37 (citing Williams, 373 F.3d at 1139) (noting that the Eleventh Circuit in Williams elected to "leave the issue" of whether the burden shifting approach applies equally to factual determinations "to another day"). Pre-Williams precedent provided that where a plan administrator is de novo wrong as to plan interpretation but where both parties meet their summary judgment burdens at the de novo stage of showing a disputed issue of fact as to whether the claimant qualifies as "disabled," the proper course is for the trial court to submit the disputed facts to bench trial. Shaw v. Connecticut General Life Insurance Co., 353 F.3d 1276, 1278 (11th Cir. 2003). Williams, however, seemed to overrule Shaw in that it contemplated administrators' de novo wrong factual determinations proceeding through reasonableness review rather than a bench trial. Burt, at *38-39.

Judges in this district have taken differing approaches at resolving factual issues under the arbitrary and capricious

standard.  The court in <u>Wise v. Hartford Life & Accident Insurance</u>
<u>Co.</u>, 360 F. Supp. 2d 1310, 1321 (N.D. Ga. 2005), noted that the
"inherent stumbling block in a strict application" of the burden
shifting approach to factual determination cases is:

> that the denial of benefits with respect to one plan
> participant always increases the reserves out of which
> other participants may receive payments, thus providing
> a constant altruistic "justification" for the insurer's
> denial of the claim vis-a-vis the beneficiaries of the
> plan. Nevertheless, where, as here, the administrator
> suffers from a "strong conflict" in that it must pay the
> claim out of its own funds, that "justification" is
> likewise invariably self-serving. . . .

<u>Id.</u> at 1321-22 (internal citation omitted).  The <u>Wise</u> court
consequently determined that a conflicted plan administrator can
carry its summary judgment burden at the arbitrary and capricious
stage "if it can demonstrate that the opinions and evidence it
relied on denying the plaintiff's claim were, viewed both from a
qualitative and quantitative perspective, at least as objectively
reliable as the countervailing opinions and evidence then before
it."  <u>Id.</u> at 1323.

The court in <u>Burt</u> noted, however, that the <u>Wise</u> approach has
the downside of "further enmesh[ing] the court in medical analyses
that it is particularly unqualified to perform."  <u>Burt</u>, 2005 U.S.
Dist. LEXIS 22810, at *40.  That court thus opted to employ, with
one caveat, the burden shifting approach specified in <u>Brown v. Blue</u>
<u>Cross and Blue Shield, Inc.</u>, 898 F.2d 1556, 1568 (11th Cir. 1990),

-43-

which requires the plan administrator to "purge the taint of self interest" by producing evidence that its determinations benefitted the class of plan participants or represented a uniform construction of the plan.  <u>Burt</u>, at *41.  The caveat was "that the claim provider cannot meet its burden simply by asserting that its denial of coverage as to one claimant benefits the plan participants to the extent that there is more money available to pay out 'worthier' claims."  <u>Id.</u>

This court shares similar concerns about its qualifications to perform the more detailed medical analysis required by the <u>Wise</u> approach, and will thus adopt the modified <u>Brown v. Blue Cross</u> analysis employed by the <u>Burt</u> court.

      2.   *Application*

         a.   *No benefit to other plan participants*

MetLife has offered no evidence that its de novo wrong, but reasonable, factual interpretation of the record benefits the class of plan participants.  MetLife argues that its claims reviewers were not compensated or given bonuses for denying claims and that it establishes no numerical guidelines or quotas for claim payments or denials.  It further claims that its acceptance of claims such as the plaintiff's could result in increased premiums for other policy holders.

These claims are rebutted, however, by evidence showing that the plaintiff's condition had not improved since MetLife had initially deemed her fully disabled – if anything, it had gotten worse.  This calls MetLife's motivation for later denying benefits squarely into question.

Next, as discussed in the court's de novo examination of the claim decision, the evidence shows that MetLife relied on the opinions of physicians who had never examined the plaintiff and who, for the most part, conducted only fragmentary reviews of the clinical notes to reach a decision that the plaintiff was not fully disabled.  MetLife's denial of the plaintiff's claim came in the face of the opinions of her treating physician, supported by extensive clinical documentation, that the plaintiff suffered from numerous serious medical conditions which were known to cause the types of debilitating symptoms the plaintiff complained of.  It is difficult to imagine how approaching claims in such a manner would benefit other plan participants.

Finally, MetLife's contention that acceptance of claims like the plaintiff's would lead to higher premiums for other policy holders is utterly unsupported by empirical evidence.  In fact, the plaintiff advances the more plausible argument that MetLife would make more money if it paid fewer claims.

b.  *Not a uniform construction of the plan*

Neither can MetLife satisfy its burden of showing that its decision represented a uniform construction of the policy.  As discussed above, MetLife's doctors appear to have required the plaintiff to submit objective proof of her disability despite the lack of any such requirement in the Plan and the absence of any definition of the term in the SPD.  The Eleventh Circuit recently held nearly identical conduct on the part of a plan administrator to be arbitrary and capricious.  See Oliver v. Coca Cola Co., 497 F.3d 1181, 1196-97 (11th Cir. 2007), rehearing granted by, vacated in part on other grounds by, Oliver v. Coca Cola Co., 506 F.3d 1316 (11th Cir. Nov. 6, 2007).  There, the plaintiff suffered from pain and submitted objective evidence of conditions which are known to cause pain, but Coca-Cola denied benefits claiming he did not submit objective proof of his pain and level of activity.  Id. at 1196-97.  The Eleventh Circuit noted that nothing in the plan excluded coverage for conditions which were not diagnosable via "objective" laboratory tests, and that Coca-Cola's peer review doctors had not disputed the treating physician's diagnoses of the underlying conditions.  The court held that,

> [b]y denying Oliver's claim on the ground that he had not
> provided "objective" evidence of his pain, despite
> Oliver's submission of uncontroverted medical evidence of
> the only sort available to prove his disability –
> including medical reports from multiple physicians

-46-

stating that his reports of pain were consistent with
their diagnoses and "did not appear to be histrionic or
exaggerated" – Coca-Cola  engaged in capricious decision
making.

Id. at 1197.

Oliver is factually very similar to the current case, and
another ground on which the court found Coca-Cola's decision to be
arbitrary and capricious is particularly relevant here.  One of
Coca-Cola's peer review physicians placed "great emphasis" on the
treating physician's failure to check a box on a physician
questionnaire form next to the phrase "[m]arked limitation of
functional capacity/capable of sedentary work." Id. at 1198.  The
court noted, however, that the peer review physician "flatly
ignored the remainder of the same evaluation form, in which
[Oliver's physician] clarified any ambiguity by explicitly stating
his opinion that Oliver was not capable of working" at all.  Id.
MetLife places similarly heavy emphasis on Dr. Silverman's failure
to complete the portion of the physician questionnaire relating to
specific functional limitations, while ignoring the fact that Dr.
Silverman clearly states elsewhere on the form that the plaintiff
simply could not perform any work.  This was willful failure to see
the forest for the trees on MetLife's part, and represents
arbitrary and capricious decision making.

Additionally, the Oliver court criticized the nature of Coca-Cola's peer review process in that its consulting psychiatrist based his opinion that Oliver was not disabled solely on psychological issues, without addressing whether Oliver was physically disabled. Id. Here, the fragmented nature of most of MetLife's physicians' reviews was of a similar nature; their opinions were largely limited to examinations of specific groups of symptoms relevant to the physicians' specialties. MetLife's reliance on these plainly myopic opinions was arbitrary and capricious.

Finally, none of MetLife's doctors appears to have examined the side effects of the plaintiff's medications in depth. Dr. Silverman noted that the plaintiff's medications cause dizziness, fatigue, and difficulty with concentration, attention, and focus. The Eleventh Circuit has held that failure to consider side effects of medications in determining whether an ERISA claimant is disabled is an example of arbitrary and capricious conduct. See Godfrey v. BellSouth Telecommunications, Inc., 89 F.3d 755, 759 (11th Cir. 1996).

After weighing all the evidence, the court concludes that MetLife's decision to terminate the plaintiff's benefits was arbitrary and capricious. MetLife clearly cannot satisfy its heavy burden of proof under Brown v. Blue Cross to purge itself of the

-48-

taint of self-interest.  898 F.2d 1556, 1568.  Indeed, even if the burden had been on *the plaintiff* to show that MetLife's decision was arbitrary and capricious, the evidence discussed above demonstrates that the plaintiff could indeed make such a showing.

              *c.   Summary*

Having thus progressed through the final step of the <u>Williams</u> analysis, the court concludes that MetLife's de novo wrong, but reasonable, claim decision was tainted by self-interest.  The court must therefore reverse it.  373 F.3d at 1138.

## III. Judgment Amount

The final step remaining in the court's involvement in the case is to set the dollar amount of the judgment.  The court supposes that fixing the monthly amount of disability payments will be straightforward, given that MetLife had already begun making such payments prior to reversing its position.  The plaintiff is, of course, also entitled to payment of past-due benefits with interest.  The parties are instructed to confer in an attempt to agree on the proper amount of the judgment.  If the parties are unable to agree, the court will consider briefing on the issue.

<u>**CONCLUSION**</u>

For the reasons stated herein, MetLife's motion for summary judgment [Doc. No. 19] is **DENIED**.  The court hereby **ORDERS**, pursuant to <u>Williams v. BellSouth Telecommunications, Inc.</u>, 373

F.3d 1132, 1137-38 (11th Cir. 2004), that MetLife's decision to deny the plaintiff long-term disability benefits is **REVERSED** and that the plaintiff is entitled to benefits.  The parties are **INSTRUCTED** to confer in an attempt to jointly establish the amount of the judgment and submit a proposed judgment to the court within 20 days of the date of this order.  In the event that the parties cannot come to an agreement on the judgment amount, the court will receive briefing on the issue in lieu of a proposed judgment no later than 20 days from the date of this order.

SO ORDERED, this <u>30th</u> day of May, 2008.

<u>/s/ Charles A. Pannell, Jr.</u>
CHARLES A. PANNELL, JR.
United States District Judge